IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MATTHIAS CHANG and HUSAM MUSA, on behalf of themselves and all others similarly situated, | § | |
| | § | CLASS ACTION |
| | § | JURY TRIAL DEMANDED |
| *Plaintiffs* | § | |
| v. | § | Civ. Case. No.: ____________________ |
| RIZA SHAHRIZ BIN ABDUL AZIZ; LOW TAEK JHO; GOLDMAN SACHS GROUP, INC.; TIMOTHY LEISSNER; CHRISTOPHER JOEY MCFARLAND; RED GRANITE PICTURES, INC.; DEBRA WHELAN JOHNSON; METROPOLIS IX CAPITAL ADVISORS, LLC | § | |
| *Defendants* | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs, the intended beneficiaries of the 1 Malaysia Development Berhad Fund ("1MDB" or "the Fund"), for their Complaint against Defendants, with knowledge as to their own actions and events, and upon information and belief as to other matters, allege as follows:[1]

[1] Plaintiffs' information and belief is based on their analysis of: (1) court documents filed or otherwise made public in current litigation against Defendants; (2) publicly available news and media articles and investigations; and (3) other sources. Plaintiffs currently lack access to all the underlying facts relating to Defendants' improper activities because much of that information lies exclusively within the possession, custody, or control of Defendants and other insiders. Plaintiffs

## I. INTRODUCTION AND NATURE OF THE ACTION

1. 1MDB is a sovereign wealth fund of Malaysia. Founded in 2009, the Fund's purpose is to drive strategic initiatives for long-term economic development for the benefit of a broad spectrum of Malaysians. The individual and corporate Defendants misappropriated money from the Fund for their own use and benefit. The American, Malaysian, and Swiss governments, among others, are presently investigating monies moved through state agencies, banks, and companies linked to the Fund. In the United States, several Defendants spent the misappropriated funds to produce the blockbuster motion picture *The Wolf of Wall Street*. They also spent the misappropriated funds to buy, among other things, valuable real property. 1MDB did not benefit from any of these expenditures. Instead, the Defendants have used funds from 1MDB to purchase and profit from real property and from earnings from the motion picture to support their own businesses and over-the-top personal lifestyles. 1MDB did not benefit from any of these expenditures.

2. Defendants Goldman Sachs Group, Inc. ("Goldman") and Timothy Leissner ("Leissner") managed several bond issues for 1MDB in 2012 and 2013. These Defendants earned extraordinarily high commissions at the expense of 1MDB and caused the bond proceeds to be handled in a way that facilitated misappropriation of the funds.

3. Plaintiffs bring this civil action to recover damages to the Fund. Plaintiffs also seek disgorgement of money Defendants took from 1MDB with the goal of restoring money that rightfully belongs to the Fund and its beneficiaries.

4. Defendant Riza Shahriz Bin Abdul Aziz ("Riza Aziz") is the stepson of the present Prime Minister of Malaysia, Najib Razak. Defendant Low Taek Jho ("Jho Low") is a

---

believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

purported Malaysian businessman and friend of Prime Minister Najib Razak and Riza Aziz. Riza Aziz and Defendant Joey McFarland ("McFarland") financed and produced *The Wolf of Wall Street* using money misappropriated from the Fund which, on information and belief, was funneled in whole or in part through Goldman.

5. Defendants Jho Low and Riza Aziz used several hundred million dollars of misappropriated funds to purchase luxurious real estate. Defendants Jho Low and McFarland received a combined $100 million in artwork, which was purchased with funds traceable to 1MDB, for no monetary consideration.

6. Defendant Debra Whelan Johnson ("Johnson") facilitated Riza Aziz's money-laundering activities. Johnson manages Riza Aziz's business and personal financial affairs at a respected Los Angeles accounting firm. After her colleagues questioned some of Riza Aziz's practices, Johnson left the firm and created an entity where such questions would no longer be asked.

## II. JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over this case pursuant to the federal question doctrine of 28 U.S.C. § 1331 and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961 *et seq.*).

8. Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. In addition, a significant portion of the tangible property at issue is located in this District.

## III. PARTIES

9. Plaintiff Matthias Chang ("Chang") is a citizen of Malaysia. Chang is a prominent Malaysian barrister and author who served as Political Secretary to the fourth prime

minister of Malaysia, Tun Dr. Mahathir Mohamad. Chang is an intended beneficiary of the 1MDB Fund.

10. Plaintiff Husam Musa ("Musa") is a citizen of Malaysia. Musa is a Malaysian politician, currently the State Assembly Member for the State of Kelantan. Musa is an intended beneficiary of the 1MDB Fund.

11. Defendant Riza Aziz is a citizen of Malaysia. Riza Aziz, on information and belief, resides at 15 West 63rd Street, Suite 2930A, New York, NY 10023-7143 and 912 North Hillcrest Road, Beverly Hills, CA 90210-2611. He is a film producer and co-founder and chairman of Defendant Red Granite Pictures, Inc. ("Red Granite").

12. Defendant Jho Low is a Malaysian national, family friend, and business associate of Prime Minister Najib Razak and his stepson, Defendant Riza Aziz. On information and belief, Jho Low has a controlling interest in several entities that are either based in the United States or conduct substantial business within the United States. His business, philanthropic, and personal activities have frequently brought him to the United States. He caused real properties to be purchased in New York using funds misappropriated from 1MDB, and he conducted business in New York ostensibly on behalf of 1MDB. This Court therefore has personal jurisdiction over Jho Low.

13. Defendant Goldman is a global investment banking, securities, and investment management firm. Goldman is a Delaware corporation with its principal place of business at 200 West Street, New York, NY 10282. In 2008, Goldman's top Southeast Asia banker at the time, Defendant Leissner, helped launch the predecessor of the 1MDB Fund. Several years after the establishment of the 1MDB Fund in 2009, Goldman made hundreds of millions of dollars

underwriting three bond deals worth a total of $6.5 billion. On information and belief, those transactions were approved and handled through Goldman's main office in New York.

14. Defendant Leissner is a German national who resides in the United States at 269 S. Beverly Dr. 1241, Beverly Hills, CA 90212-3851. On information and belief, Defendant Leissner also maintains a residence at The Marquand Building, 11 East 68th Street, New York, NY 10065, and regularly travels to New York for business and personal purposes. Because he has continuous and systematic contacts with New York, this Court has personal jurisdiction over Defendant Leissner.

15. Defendant McFarland is a citizen of the United States and California. He resides at 428 N. Crescent Heights Blvd., Los Angeles, CA 90048-2206. He is the Vice Chairman/Producer of Red Granite. On information and belief, he has traveled to New York to conduct business for Red Granite, including business involving funds misappropriated from 1MDB. This Court accordingly has personal jurisdiction over McFarland.

16. Defendant Red Granite is a California corporation with its principal place of business at 9255 W. Sunset Blvd., Suite 710W, Los Angeles (West Hollywood), CA 90069-3309. Red Granite, a film production company, underwrote and produced *The Wolf of Wall Street*, which was released in 2013. On information and belief, several Defendants used the Fund's money to obtain rights to produce the motion picture. On information and belief, Red Granite conducted business in New York using funds misappropriated from 1MDB.

17. Defendant Johnson is a citizen of the United States and California. She resides at 10586 W. Pico Blvd, Los Angeles, CA 90064-2332. Johnson, a tax attorney, manages Riza Aziz's assets. She is the Chief Operating Officer of Defendant Metropolis IX Capital Advisors, LLC. On information and belief, she conducted business in New York using funds

misappropriated from 1MDB and met in New York with Riza Aziz and others to manage the misappropriated funds.

18. Defendant Metropolis IX Capital Advisors, LLC ("Metropolis IX") is a California limited liability company with its principal place of business at 10960 Wilshire Blvd., 5th Floor, Los Angeles, CA 90024. On information and belief, Defendant Johnson is its sole member. Metropolis IX manages assets for high net-worth individuals. On information and belief, Metropolis IX manages Riza Aziz's private and business affairs. On information and belief, Metropolis IX conducted business in New York using funds misappropriated from 1MDB, and Metropolis IX's representatives met in New York with Riza Aziz and others to manage the misappropriated funds.

## IV. FACTS

### A. Background

19. In 2009, Malaysia's Prime Minister Najib Razak inaugurated the 1MDB fund to boost Malaysia's economy.

20. Rather than aid the nation's economy, 1MDB has generated global controversy with active regulatory and criminal investigations in the United States, United Kingdom, Switzerland, Luxembourg, the United Arab Emirates, Australia, China (Hong Kong), Singapore, Thailand, and Malaysia.[2] The Fund has been implicated in unlawful activity involving numerous entities. One such entity is a small private Swiss bank, BSI Ltd. of Lugano, whose parent is BSI

---

[2] Shamim Adam & Cedric Sam, *How Malaysia's 1MDB Fund Scandal Reaches Around the World*, April 13, 2016, http://www.bloomberg.com/graphics/2016-malaysia-1mdb/

SA ("BSI"), which received investment capital on behalf of the Fund. BSI has effectively been shuttered because of its involvement in misappropriations of 1MDB funds.[3]

**1. Leissner and Jho Low Participate in the Start of the Fund**

21. Leissner and Jho Low were instrumental to the 2008 formation of a sovereign wealth fund called Terengganu Investment Authority ("TIA"), the predecessor to the 1MDB Fund. Terengganu is an oil-rich sultanate of Malaysia. On April 8, 2009, Jho Low was appointed as an official advisor to TIA.

22. Jho Low's connection to the key players behind the TIA and 1MDB Funds is traceable to his school days. He graduated from the elite Harrow School in London in 2000. It was during his time in London that he befriended Riza Aziz when Aziz was studying at the London School of Economics. He reportedly also met and befriended Mr. Aziz's mother, Rosmah Mansor, when she came to visit her son in London. Rosmah Mansor is the wife of Malaysian Prime Minister Najib Razak. The son of a rich Malaysian businessman, Jho Low later graduated from the Wharton School of Business at the University of Pennsylvania in 2005 and became a financial consultant. At these schools Jho Low established connections with several prominent Kuwaiti and Jordanian families and influential Southeast Asians with whom he would later do business. None of these contacts, however, was of more help to Jho Low than Riza Aziz and his stepfather, the Prime Minister.

23. In April 2009, Riza Aziz's stepfather, Najib Razak, became prime minister of Malaysia. Malaysia is a parliamentary democracy with a federal constitutional monarch. As Prime Minister, Najib Razak is the head of government. He is also the Finance Minister. Prime Minister Najib Razak was the initial chairman of 1MDB's advisory board and has overseen the

---

3 Jake Maxwell Watts & John Letzing, *Swiss Bank Is Charged Over 1MDB Dealings*, Wall St. J., May 24, 2016.

Fund until the board was dissolved in May of 2016. He is still authorized to sign off on the Fund's major transactions.

24. By July 22, 2009, Prime Minister Najib Razak had announced his decision to transform TIA into a Malaysia-wide entity. This entity was to create "a long-term sustainable economic development in Malaysia and promote the inflow of FDI."[4] By forging global partnerships and promoting "FDI" or foreign direct investment, the Fund was to benefit not only the people of Terengganu but all Malaysians.

25. Jho Low reportedly was chosen to orchestrate Prime Minister Najib Razak's takeover of TIA. In 2009, the TIA fund's shares were transferred to the government of Malaysia and the name of the fund changed to 1MDB. According to former Prime Minister Tun Dr. Mahathir Mohamad, "Jho Low persuaded Najib to make the TIA into a sovereign fund for investment like the Kuwait Investment Fund but under Najib's control."[5] It is widely reported that Jho Low's role with 1MDB went well beyond merely providing advice during the Fund's initial stages. He served as an advisor to the Fund and reportedly had a "central role" in the both disbursing and personally receiving 1MDB funds.[6]

26. Recently, the Federal Government filed verified asset-forfeiture complaints alleging money laundering involving funds missing from 1MDB on an unprecedented scale.[7]

---

[4] 1MDB Website, *We Will Forge Strategic Global Partnership to Spur FDI*, Dec. 14, 2009, http://1mdb.com.my/news-coverage/we-will-forge-strategic-global-partnership-to-spur-fdi

[5] Lee Weng Khuen, *Tun M Details All That Is Wrong With 1MDB*, The Sun Daily, June 12, 2015, http://www.thesundaily.my/news/1457558.

[6] Tom Wright & Bradley Hope, *Malaysia Prime Minister's Confidant Had Central Role at Troubled 1MDB Fund*, Wall St. J., April 19, 2016.

[7] *United States v. "The Wolf of Wall Street" Motion Picture, Including any Rights to Profits, Royalties and Distribution Proceeds, Owed to Red Granite Pictures, Inc., or its Affiliates and/or Assigns*, No. 2:16-cv-05362 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. Real Property Located in Beverly Hills, California*, No. 2:16-cv-05363 (C.D. Cal. Comp. filed Jul. 20, 2016); *United States v. Any Rights to Profits, Royalties and Distribution Proceeds Owned by or Owed to JW Nile BVI Ltd., JCL Media EMI Publishing Ltd, and or Jynwel Capital Ltd, Relating to EMI*

According to the Government's complaint, Jho Low was central to the misappropriation of 1MDB funds.[8] Between 2009 and 2011, more than $1 billion were transferred from 1MDB under the guise of a joint venture with PetroSaudi International, which is a private Saudi Arabia-based oil services company.[9] Through an intricate series of steps in the Fall of 2009, 1MDB funds were moved through a joint venture company called 1MDB PetroSaudi Ltd., via suspicious loans and loan repayments involving numerous entities, with $700 million and, later in 2011, $330 million eventually making its way into an account for Good Star Ltd. ("Good Star"), a company controlled by Jho Low and his associates.[10] The 2009 Joint Venture Agreement provided 1MDB a 40% equity stake in various entry interests located in Turkmenistan and Argentina in exchange for $1 billion from 1MDB deposited into the Joint

---

*Music Publishing Grp. N. Am. Holdings, Inc., and D.H. Publishing L.P.*, No. 2:16-cv-05364 (C.D. Cal. Comp. filed Jul. 20, 2016); *United States v. One Pen and Ink Drawing by Vincent Van Gogh Titled la Maison de Vincent a Arles, One Painting by Claude Monet titled Saint-Georges Majeur and One Painting by Claude Monet Titled Nympheas Avec Reflets de Hautes Herbes*, No. 2:16-cv-05366 (C.D. Cal. Comp. filed Jul. 20, 2016); *United States v. One Bombardier Global 5000 Jet Aircraft, Bearing Mfr's Serial No. 9265 and Registration No. N689WM, its Tools and Apurtenances, and Aircraft Logbooks*, No. 2:16-cv-05367 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. The Real Property Known as the Viceroy LErmitage Beverly Hills*, No. 2:16-cv-05368 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. All Business Assets of the Viceroy LErmitage Beverly Hills*, No. 2:16-cv-05369 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. All Right to and Interest in Symphony CP Park Lane LLC*, No. 2:16-cv-05370 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. Real Property Located in New York, New York*, No. 2:16-cv-05371 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. Real Property Located in New York, New York*, No. 2:16-cv-05374 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. Real Property Located in New York, New York*, No. 2:16-cv-05375 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. Real Property Located in New York, New York*, No. 2:16-cv-05376 (C.D. Cal. Compl. filed Jul. 20, 2016); *United States v. Real Property Located in Beverly Hills, California*, No. 2:16-cv-05377 (C.D. Cal. Comp. filed Jul. 20, 2016); *United States v. Real Property Located in Los Angeles, California*, No. 2:16-cv-05378 (C.D. Cal. Comp. filed Jul. 20, 2016); *United States v. Real Property Located in Beverly Hills, California*, No. 2:16-cv-05379 (C.D. Cal. Comp. filed Jul. 20, 2016); and *United States v. Real Property in London, United Kingdom, owned by Qentas Holdings*, No. 2:16-cv-05380 (C.D. Cal. Comp. filed Jul. 20, 2016).

[8] The Government's complaints are essentially identical with each against a different defendant asset, but all target assets are mentioned in each complaint and all actions are pending before the Honorable Dale S. Fischer of the Central District of California. For ease of reference, Plaintiffs refer to the complaint in Case No. 2:16-cv-05362.

[9] Compl. ¶¶ 40-43.

[10] *See id*. at ¶¶ 59-98.

Venture account at BSI Bank.[11] The Malaysian Public Accounts Committee ("PAC"), which is the Parliamentary committee responsible for examining the accounts of public authorities and other bodies administering public funds, was unable to validate the legitimacy of the $700-million transaction.[12] In 2011, $330 million was funneled to Good Star under similar false pretenses.[13]

**2. Goldman Sachs Issues $6.5 Billion in Bonds for the Fund**

27. Goldman routinely underwrites bonds for sovereign entities. One of Goldman's top regional bankers at the time, Defendant Leissner, was involved with the formation of TIA, 1MDB's predecessor, and in advising and orchestrating bond issues for 1MDB. Jho Low reportedly steered much of the Fund's lucrative business to Goldman and Leissner. Goldman has in fact underwritten multiple bond transactions for the 1MDB Fund, raising more than $6.5 billion in investment capital and netting for itself approximately $590 million in fees, commissions and expenses.[14]

28. In May 2012, Goldman sold $1.75 billion in privately-placed notes for the Fund. Fees, commissions, and expenses exceeded $200 million. While the lion's share of the receipts were sent to the London Branch of BNY Mellon, $577 million found its way into another account within one day of 1MDB's having received the proceeds: [15] Aabar Investments PJS Ltd. ("Aabar"), a British Virgin Islands company with a name deceptively similar to a company with which 1MDB did legitimate business.[16] The transactions are summarized:

---

[11] *Id*. at ¶¶ 52-54.
[12] *Id*. at ¶ 56(d).
[13] *Id*. at ¶ 91.
[14] *See* Mia Lamar, Bradley Hope, and Justin Baer, *U.S. Examines Goldman Sachs Role in 1MDB Transactions*, Wall St. J., Oct. 14, 2015.
[15] Compl. ¶¶ 126-27.
[16] *Id*. at ¶ 129.




29. In October 2012, Goldman sold another $1.75 billion offering, which was also accomplished through private placement. Fees, commissions, and expenses exceeded $113 million.[17] Similar to the May 2012 transaction, $790 million was diverted to Aabar the same day the proceeds were received:[18]




30. A total of $1.368 billion was thus almost instantaneously misappropriated to Aabar, an entity in the British Virgin Islands. Aabar is not Aabar Investments PJC, which though similar named, is a distinct entity incorporated in Abu Dhabi and controlled by a sovereign-wealth fund of the United Arab Emirates called the International Petroleum Investment Company.[19]

31. Aabar proceeded to transfer $636 million to an entity called Blackstone Asia Real Estate Partners. Blackstone proceeded to distribute approximately $574 million to the officers of the International Petroleum Investment Company, Aabar, and 1MDB. This included a payment of $5 million to an account for whom the beneficial owner is 1MDB's former chief counsel,

[17] *Id.* at ¶ 138.
[18] *Id.* at ¶ 140.
[19] *Id.* ¶¶ 112-15.

Jasmine Loo Ai Swan ("Loo"). According to *Bloomberg*, Loo operated as the point person between Goldman and 1MDB for the 2012 bond issues and is a friend of Jho Low.[20]

32. Yet, just six months later in 2013, Goldman proceeded to offer and issue the $3 billion in bonds. Same action, same result.

33. In the Offering Circular, moreover, Goldman proclaimed in bolded lettering that such was "**NOT FOR DISTRIBUTION TO ANY PERSON OR ADDRESS IN THE UNITED STATES**" and required all recipients to acknowledge that that they are not located in the United States. Yet Goldman did not conduct sufficient due diligence after the 2012 issues to allow this Securities Act Schedule S Offering Circular.

34. Goldman received a nearly $300 million commission for the 1MDB Fund's 2013 $3 billion bond issue. That 10% commission is almost four times the typical rate.[21]

35. While Goldman has defended its commissions as commensurate with the risk it assumed by buying the entire bond issue, the $300 million commission is far in excess of the commissions firms like Goldman typically earn for similar offerings. The commission attributable to the 1MDB bonds was one of Goldman's largest commissions of 2013.

36. The proceeds of the $3 billion issue, which were ostensibly for a multi-year property-development project, were sent indirectly to 1MDB via BSI Ltd., a small Swiss bank.[22] Normally, a transaction of this size would be handled by a large international bank. BSI, however, sent $1.26 billion to a suspicious entity as detailed below.

---

[20] Greg Farrell, Elffie Chew, & Dakin Campbell, *Fund Lawyer Who Worked With Goldman Holds 1MDB Clues, U.S. Says*, July 27, 2016, http://www.bloomberg.com/news/articles/2016-07-27/fund-lawyer-who-worked-with-goldman-holds-1mdb-clues-u-s-says

[21] Una Galani, A Goldman Risk, BreakingViews, Aug. 6, 2015, http://www.breakingviews.com/malaysia-mess-puts-goldman-sachs-in-the-hot-seat/21210973.article

[22] According to the bond circular Goldman issued, the proceeds were to be deposited into the London Branch of BNY Mellon.

37. The *Wall Street Journal* reported that the law firm involved in the bond issue sent a note to Goldman's bankers questioning the propriety of sending the $3 billion to BSI. According to the *Wall Street Journal*, a Goldman representative stated that it checked BSI's credentials and found no reason not to send the money there.[23]

38. As for the nature of the project to be funded by the bond issue, Goldman executives said that they relied on the Malaysian government's statements that the bond proceeds were being used as intended. Further, Goldman said it could justifiably rely on those statements because 1MDB is a government-owned fund. Nevertheless, Goldman agreed to pay out the full bond issue immediately, even though the stated purpose was a construction project which would take years to complete.

39. Goldman and the 1MDB Fund managers failed to follow the Generally Accepted Principles and Practices of the International Working Group of Sovereign Wealth Funds, which are commonly referred to as the "Santiago Principles." The Santiago Principles are a set of widely adopted guidelines for the management of sovereign wealth funds such as the 1MDB Fund. The principles are observed by funds and governments as well as the financial advisors who serve them. Goldman's bond issues for 1MDB, particularly the outsized commissions, run afoul of these principles. In addition, Principle 14 required that the 1MDB fund deal with third parties (Goldman) "based on economic and financial grounds." There was no economic or financial justification for paying the huge commissions or for paying out the full bond issue immediately.

40. Governments have taken a skeptical view of the bond transaction. The Monetary Authority of Singapore has suspended BSI's license for anti-money-laundering failures—

[23] Justin Baer, Tom Wright, & Bradley Hope, *Goldman Probed Over Malaysia Fund 1MDB,* Wall St. J., June 7, 2016.

effectively shuttering a 143-year-old institution—and the Swiss government has launched a criminal investigation.

41. Of the $3 billion raised in the 2013 Goldman bond offering, a 1MDB spokesperson has confirmed that half of it was funneled into offshore investment funds. The reason given was that the money was not immediately needed. At least $210 million was sent to Devonshire Funds, which in turn transferred it to Tanore Finance.[24] Tanore Finance is a now-defunct British Virgin Islands (BVI) shell company. Coincidentally, Tanore transferred $681 million into Prime Minister Najib Razak's personal account in March 2013, which happens to be the same month Goldman sold the $3 billion in bonds[25]:




42. Defendant Leissner later wrote a letter of reference on Goldman letterhead, recommending Defendant Jho Low to another bank. In January 2016, following his suspension from Goldman and amid questions about his role in the allegedly inaccurate reference letter and his work with the 1MDB Fund, Leissner left Goldman Sachs and moved to Los Angeles.[26] In a February 2016 regulatory filing, Goldman disclosed that it suspended Leissner for writing a

---

[24] *Id*.

[25] *See* Compl. ¶ 264.

[26] Cathy Chan, Joyce Koh and Elffie Chew, *Goldman Sachs's Leissner Moves to Los Angeles, Takes Personal Leave*, Bloomberg, January 27, 2016.

reference that contained inaccurate information and without sufficient due diligence.[27] Goldman has not publically disclosed nor discussed that the above events factored into Leissner's termination.

**3. 1MDB Capital Finds Its Way Back to the United States**

43. Money linked to misappropriated 1MDB funds has circulated around the world, including the United States. The misappropriated funds were diverted to, among other places, shell companies and personal accounts connected to Defendants Riza Aziz and Jho Low.

44. When news began to emerge of the investigations into 1MDB, Jho Low, because of his connections to the Prime Minister's family, his involvement with the 1MBD Fund, and his lavish spending and "playboy" lifestyle, became the subject of increased scrutiny.

45. For example, emails leaked to the press indicate that Jho Low was able to siphon $700 million dollars from a joint venture between 1MDB and the leading oil exploration and production company PetroSaudi International Ltd. Approximately $700 million in 2009 and $330 million in 2011 of these monies went directly into Jho Low's Good Star account and to date has not been satisfactorily accounted for.

46. The 1MDB Fund's $700 million so-called "loan" to PetroSaudi International Ltd. was presented as repayment under a joint venture agreement, but the money was directed to Good Star and then used to execute a series of deals proposed by Jho Low. As detailed in the Government's complaint and by PAC of the Malaysian Parliament, the 1MDB-PetroSaudi

[27] Greg Farrell, Dakin Campbell and Elffie Chew, *Leissner Letter That Lead to Goldman Exit Written for Jho Low*, Bloomberg, April 6, 2016; FINRA BrokerCheck website, Report #27240-83864 (Tim Leissner, CRD# 3146057), http://brokercheck.finra.org/Report/Download/47205428 (last visited August 8, 2016).

company's $700 million loan repayment to PetroSaudi in 2009 cannot be verified. Rather, this sum was channeled to Good Star for the benefit of Jho Low.[28]

47. According to the verified complaints for asset forfeiture *in rem* filed by the United States Department of Justice in Los Angeles Federal District Court Case Nos. 2:16-cv-05363, 2:16-cv-05368, 2:16-cv-05369. 2:16-cv-05371, 2:16-cv-05374, 2:16-cv-05377, 2:16-cv-05378, and 2:16-cv-05379 (C.D. Cal. Compls. filed Jul. 20, 2016), the following pieces of real property ("the Real Properties") were obtained from money Jho Low and/or Riza Aziz misappropriated from 1MDB:

- 15 West 63rd Street, Suite 2930A, New York, NY 10023-7143, described as a Park Laurel condominium overlooking Central Park;
- Time Warner Center at 80 Columbus Circle, PH 76-B PH52A, New York, NY 10023;
- Park Lane Hotel, 36 Central Park South, New York, NY 10019;
- L'Ermitage Beverly Hills Hotel, 9291 Burton Way, Beverly Hills, CA 90210;
- 912 North Hillcrest Road, Beverly Hills, CA 90210-2611, described as a residential home located in Beverly Hills, CA; and
- 1423 Oriole Drive, Los Angeles, CA 90069, described as a residential home located in Los Angeles, CA.[29]

---

[28] *See* Compl. ¶¶ 46, 56-57, and 103-08.

[29] *See also* Bradley Hope & Tom Wright, *Malaysian Leader Najib's Stepson Allegedly Funded U.S. Property Deals With 1MDB Money*, Wall St. J., May 11, 2016; Louise Story & Stephanie Saul, *Jho Low, Well Connected in Malaysia, Has an Appetite for New York*, N.Y. Times, Feb. 8, 2015; and Louise Story, *Malaysia's Leader, Najib Razak, Faces U.S. Corruption Inquiry*, N.Y. Times, Sept. 21, 2015; Jynwel Capital website, *An Investment Consortium Led By the Witkoff Group Backed by Jynwel Capital Closes on Park Lane Hotel*, http://www.jynwelcapital.com/media/press-releases/investment-consortium-led-witkoff-group-backed-jynwel-capital-closes-park-lane.

48. According to the Government's verified complaint and various news accounts, Riza Aziz and Jho Low spent much of the Fund's money in the United States on the Real Properties, business ventures, yachts, parties, artwork, clothing, jewelry, and other luxuries.

49. Riza Aziz and Jho Low regularly appeared in gossip columns with their celebrity party guests. In an effort to divert attention from his business deals and lavish spending, Jho Low also publicized his charitable donations. For example, Jynwel Charitable Foundation, of which Jho Low is a co-director, committed a $50 million donation to the MD Anderson Cancer Center's leukemia department in Houston, Texas.[30] Riza Aziz and Jho Low have publicly professed that their business acumen and personal and family connections generate income to support their extravagant spending. In reality, these Defendants appear to have raided the Fund's coffers to fund their personal ventures, including *The Wolf of Wall Street*, and to acquire the Real Properties made the subject of this action.

**B. 1MDB's Money Funded Red Granite and "*The Wolf of Wall Street*"**

50. Riza Aziz and McFarland co-founded Red Granite, a film production company, in 2010. In 2011, Red Granite launched itself with a million-dollar beach extravaganza at the Cannes Film Festival in France, with fireworks and performances by hip-hop artist Kanye West and rapper Pharrell Williams.

51. Through their involvement with Red Granite, Riza Aziz, Jho Low, and McFarland have materially benefited from misappropriated funds traceable to the 1MDB Fund.

52. Leonardo DiCaprio produced and starred in *The Wolf of Wall Street*. According to the *Wall Street Journal*, DiCaprio spent six years attempting to obtain funding for the film

[30] Ariana Eunjung Cha, *Why This Former Billionaire Party Boy Donated $50 Million to Try to Teach Watson to Be a Cancer Expert*, The Washington Post, June 26, 2015.

because established studios were not willing to invest in the "risky" project.[31] Despite being new to the industry and having produced only one movie prior to *The Wolf of Wall Street*, Red Granite was able to acquire rights to the film by, among other inducements, fronting the approximately $100 million required to produce the motion picture.

53. The film was released to theaters on December 25, 2013. Total worldwide box-office receipts are in excess of $392 million. DiCaprio earned an Oscar nomination for his role in the film. Jho Low received a "special thanks" in the film's closing credits.

**1. Red Granite's Funding Linked to 1MDB Money**

54. At the time the *Wolf of Wall Street* was produced, the origin of Red Granite's seed money was murky, but recent investigations have revealed that the company was backed by 1MDB's funds. Over $150 million of IMDB's money reportedly was siphoned into the Red Granite venture.[32]

55. Shell companies, Riza Aziz and Jho Low's *modus operandi*, were used to divert money from 1MDB to Red Granite. The diversion reportedly occurred as follows: (a) approximately $155 million was transferred from 1MDB to a BVI company called Aabar Investments PJS Ltd. ("Aabar"). Aabar has a name deceptively similar to a company with which 1MDB did legitimate business; (b) $105 million was transferred from Aabar to Red Granite Capital, a BVI company set up to fund Red Granite; (c) $50 million was transferred from Aabar to a fund called Falcon Opportunity Fund and from there to Telina Holdings, another BVI company; (d) Telina Holdings transferred the $50 million to Red Granite Capital; and (e) in the

---

[31] Bradley Hope, John R. Emshwiller, & Ben Fritz, *The Secret Money Behind "The Wolf of Wall Street,"* Wall St. J., April, 1, 2016.
[32] *Id.*

final step, Red Granite Capital transferred $155 million to Red Granite Pictures, Inc., the Defendant in this case. The following graphic appeared in the *Wall Street Journal*:[33]




56. On information and belief, the misappropriated funds originated from Goldman bond offers.

57. On information and belief, Plaintiffs allege that Defendant Johnson facilitated and participated in these transactions.

58. At the time, Johnson was a managing director of a Los Angeles-based accountancy firm called Nigro Karlin Segal Felstein & Bolno ("NKSFB"). That firm handled Riza Aziz's accounts with Johnson as lead partner.[34]

59. According to the Government's complaint, on October 13, 2013, a NKSFB partner raised a concern about Riza Aziz's 2012 federal income tax return.[35] The Government's complaint states:

> a. In an email dated October 13, 2013, a partner at NKSFB wrote: "We need something for our files that explains why AABAR Investments gave a gift to Riza for $94,300,050

---

[33] *Id*.
[34] *See* California Secretary of State entry for Red Granite International, Inc., in a publically available document dated June 21, 2014.
[35] Compl. ¶ 209.

and it was not income. Is someone from the company related to Riza? . . ."

b. By email dated the same day, a Managing Director at NKSFB who acted as the business manager for AZIZ and Red Granite ("Red Granite Business Manager"), responded: "It is the personal holding company of a family friend."

c. The partner, in a response sent within an hour, indicated in relevant part: "The funds came from an investor in Red Granite Capital, I cannot sign the returns without proof it is not income to Riza. The firm would be put at risk, these numbers are too high."[36]

60. On information and belief, the above-named NKSFB Managing Director is Defendant Johnson.

61. Shortly thereafter, on April 10, 2014, Metropolis IX was incorporated in California as a new capital management company.[37]

62. Johnson is the chief operating officer at Metropolis IX.[38] On information and belief, Red Granite is no longer a client of NKSFB. Rather, on information and belief, Johnson runs Metropolis IX, and that Metropolis IX's only major client is Riza Aziz. Johnson is well-compensated for those services, and on information and belief, her compensation includes funds misappropriated from 1MDB.

**2. Red Granite Spends 1MDB's Money**

63. 1MDB and its investors or beneficiaries received none of the earnings from Red Granite or the motion picture *The Wolf of Wall Street*. Riza Aziz, Jho Low, and McFarland knew that Red Granite was not funded by legitimate investors but instead with illicitly obtained money. They nevertheless proceeded to spend that money on Red Granite's productions—and

---

[36] *Id.*
[37] *See* California Secretary of State entry for Metropolis IX Capital Advisors, LLC, in a publically available document dated June 21, 2014.
[38] *See* Johnson's publically available LinkedIn Profile (last checked Jun. 24, 2016).

on sumptuous parties featuring celebrities—and to take profits for their own enjoyment. They materially benefited from money traceable to the 1MDB Fund. The Fund, in contrast, received nothing. The Fund instead suffered the loss of the $155 million these Defendants misappropriated to make the motion picture.

64. Red Granite's office contains rare and valuable Hollywood memorabilia, including a 1927 *Metropolis* movie poster worth more than $1 million.[39]

65. In November 2012, Red Granite threw a birthday party for Leonardo DiCaprio. Red Granite spent more than one million dollars on alcohol, most of it on $25,000-a-piece bottles of champagne. DiCaprio received something more lasting as well: Marlon Brando's 1955 Academy Award statuette for Brando's performance as Best Actor. Red Granite reportedly purchased the statuette for $600,000 from a New Jersey dealer. Neither the party nor the gift to DiCaprio benefitted 1MDB in any way. Rather, Defendants gave the gift to curry favor with DiCaprio and burnish their celebrity credentials.

66. On information and belief, Red Granite picked up the tab for Riza Aziz, Jho Low, McFarland, DiCaprio, and others involved in *The Wolf of Wall Street*'s production, to celebrate New Year's Eve in both Australia and Las Vegas on December 31, 2012. The festivities included the charter of a private jet, the cost of which, on information and belief, was borne by 1MDB's funds.

67. In 2014, Riza Aziz, Jho Low, and DiCaprio used funds misappropriated from 1MDB to attend the World Cup in Brazil. They stayed aboard a rented 482-foot yacht named the *Topaz.*

---

[39] Bradley Hope, John R. Emshwiller, & Ben Fritz, *The Secret Money Behind "The Wolf of Wall Street,"* Wall St. J., April, 1, 2016.

### 3. <u>Jho Low and McFarland Receive $100 Million in Artwork</u>

68. Jho Low and McFarland not only benefited from Red Granite's excesses, they each acquired some artwork from Eric Ran Kim Loong ("Tan"). Tan, a friend of Jho Low, is the sole beneficial owner of the aforementioned Tanore Finance Corporation. According to the Government's complaint, Tan purchased several pieces of artwork with funds from the Tanore Finance Corporation.[40]

69. As detailed above, $1.26 billion in proceeds raised for 1MDB were diverted into the Tanore Account.

70. With each artwork, Tan wrote a letter indicating that the piece was a gift in consideration for the recipients' generosity, support, trust, and friendship. Each letter ended with note that the gifted artwork "should not in any event be constructed as an act of corruption since this is against the Company and/or my principles and I personally do not encourage such practices in any manner whatsoever."[41] So passed more than $100 million of artwork.

## C. Defendants Jho Low and Riza Aziz Acquire Real Properties with Money Traceable to 1MDB

71. The Government's verified asset-forfeiture complaint alleges money laundering involving funds missing from 1MDB on an unprecedented scale. That action includes property purchases in the U.S. involving Jho Low, Riza Aziz, and the transfer of millions of dollars into Prime Minister Najib Razak's personal accounts.[42] The Government's complaint emphatically

---

40 Compl. ¶¶ 280-290.

41 *Id.* at ¶ 287.

42 Vishaka Sonawane, *Malaysia 1MDB Scandal: Najib Razak's Stepson Riza Aziz Allegedly Spent About $50M From Fund On New York, Los Angeles Properties, Int'l Business Times*, May 12, 2016, available at <u>http://www.ibtimes.com/malaysia-1mdb-scandal-najib-razaks-stepson-riza-aziz-allegedly-spent-about-50m-fund-2367868</u>

rejects Prime Minister Najib Razak's explanations about the origins and purpose of hundreds of millions of dollars deposited into his personal bank accounts.[43]

72. As part of their scheme, Jho Low and Riza Aziz set up shell companies to purchase the Real Properties using the misappropriated funds.

73. Jho Low's brother, Szen Low, is the manager of Wynton Real Estate (doing business as L'Ermitage Beverly Hills). In 2010, through his family fund, Wynton Real Estate, Jho Low purchased the luxury hotel L'Ermitage Beverly Hills, a member of the Viceroy Group of Hotels, for an estimated $44 million.[44]

74. Jho Low utilized shell companies to purchase a $17.5 million mansion located at 912 North Hillcrest Road, Beverly Hills, CA 90210. He then flipped ownership to a corporate entity controlled by Riza Aziz.[45] Riza Aziz has confirmed ownership of this property, according to the *Wall Street Journal*. Coincidentally, the 912 North Hillcrest Road property is close to Red Granite's office.

75. In early 2010 Jho Low, via shell companies, purchased a $24 million apartment in Manhattan overlooking Central Park. The apartment is described as a Park Laurel condominium located at 15 West 63rd Street, Suite 2930A, New York, NY 10023-7143. Jho Low later transferred the shell companies to his friend Riza Aziz. Riza Aziz reportedly now owns this property via the shell companies.[46]

---

43 Richard C. Paddock, *Justice Dept. Rejects Account of How Malaysia's Leader Acquired Millions*, New York Times, July 22, 2016.

44 Maureen Farrell, *Meet the Man Behind the Reebok Bid*, Wall St. J., Oct. 21, 2015; see also the estimated sales price for L'Ermitage Beverly Hills available at http://www.hotelnewsnow.com/media/File/PDFs/Misc/20101111_assets_CBRE_Q3trades.pdf

45 Louis Story & Stephanie Saul, *Jho Low, Well Connected in Malaysia, Has An Appetite for New York*, N.Y. Times, Feb. 8, 2015.

46 *Id.*

76. Jho Low later took a tour of 76th floor Penthouse (76B) at the Time Warner Center condominium in New York City, once owned by Jay Z and Beyoncé. In early 2011, Jho Low purchased this 4,825 square foot property for $30.55 million through a shell company connected to his family trust.[47]

77. Jho Low reportedly also purchased a mansion in Hollywood Hills at 1423 Oriole Drive for just under $39 million dollars.[48]

78. Important to these transactions was the US-based law firm of Shearman & Sterling LLP ("Shearman"). From October 2009 to October 2010, eleven wires totaling approximately $368 million were sent from Good Star to an Interest on Lawyer Account held by Shearman ("Shearman IOLA Account").[49] Properties purchased thusly included L'Ermitage Beverly Hills,[50] the North Hillcrest Road property in Beverly Hills,[51] the Park Laurel Condominium in New York City,[52] and the Time Warner Penthouse also in New York City.[53] Shearman's unnamed attorneys failed to exercise due diligence and participated in questionable transactions for the benefit of the firm and to the detriment of the Fund's rightful beneficiaries.

## V. CLASS ACTION ALLEGATIONS

79. Plaintiffs represent the intended beneficiaries of the Fund, the citizenry of Malaysia. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who were the intended beneficiaries of the 1MDB fund, and who were thereby damaged by the above-alleged allegations. Excluded from

---

47 *Id*.
48 Compl. ¶ 352.
49 *Id.* at. ¶¶ 104-06.
50 *Id.* at ¶¶ 292-305.
51 *Id.* at ¶¶ 306-22.
52 *Id.* at ¶¶ 323-31.
53 *Id.* at ¶¶ 344-50.

the Class are Defendants, the officers and directors of the 1MDB Fund at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest. For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by, or are under common control with one of the Defendants.

80. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

81. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interests which conflict with those of the Class.

82. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. whether the laws were violated by Defendants' act as alleged herein;

b. whether Defendants' conduct caused the members of the Class to sustain damages; and

c. the extent of damage sustained by Class members and the appropriate measure of damages.

83. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally,

the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## VI. CLAIMS FOR RELIEF

### First Cause of Action: Fraud, Constructive Trust

### (Against Defendants Riza Aziz, Jho Low, McFarland, Johnson and Leissner)

84. Plaintiffs reallege and reincorporate by reference the preceding allegations as through fully set forth herein.

85. At all times herein mentioned, Plaintiffs and the Class had, and continue to have, claims to the misappropriated funds. Plaintiffs and the Class are entitled to restoration of the misappropriated funds and the property derived from the funds.

86. On information and belief, Plaintiffs allege that Defendants Riza Aziz, Jho Low, McFarland, and Johnson, despite having knowledge of the Plaintiffs' interest in the money, represented that the funds were those of Defendants. They continue to hold or have otherwise gained financially from tangible items purchased with the misappropriated funds.

87. On information and belief, Plaintiffs allege that Defendant Leissner accepted misappropriated funds in the form of kickbacks disguised as commissions.

88. The Court should impose a constructive trust over these tangible assets and ensure that the tangible assets are restored to the Fund or to Plaintiffs.

**Second Cause of Action: Conversion**

**(Against All Defendants)**

89. Plaintiffs reallege and reincorporate by reference the preceding allegations as though fully set forth herein.

90. Plaintiffs had an interest in and had legal rights to the misappropriated funds.

91. On information and belief, Plaintiffs allege that the Defendants assumed and exercised control over the misappropriated funds in a manner that ousted Plaintiffs' rights therein.

92. Defendants Riza Aziz, Jho Low, McFarland, and Red Granite used misappropriated funds to finance and produce *The Wolf of Wall Street*.

93. Defendants Riza Aziz, Jho Low, McFarland, and Red Granite further spent misappropriated funds on personal parties, travel, gifts and decorations, and on items otherwise not inuring to the benefit of Plaintiffs.

94. Defendants Goldman and Leissner accepted misappropriated funds in the form of kickbacks disguised as commissions.

95. Defendant Leissner represented to his superiors at Goldman that the transactions involving 1MDB Fund legitimately required the structure of raising funds immediately. On information and belief, Defendant Leissner knew that the structure was unnecessary because the funds to be raised were not immediately required. Defendant Leissner, nevertheless, used the false rationale to justify the transactions and the well-above-market commissions.

96. Defendant Leissner and unknown individuals authorized the transfer of large sums from the BNY Mellon, London Branch, to BSI, from which substantial sums were almost instantaneously transferred.

97. Defendant Leissner had knowledge of Plaintiffs' interest in the money. He has gained financially from the misappropriated funds. He has engaged in multiple financial transactions within the United States—including a $3 billion bond issue—with knowledge that the property involved represented the proceeds of illegal activity and with knowledge that the transactions were designed to conceal the nature, location, source, ownership, or control of the proceeds of the illegal activity. The transactions occurred in 2013 and earlier. He has gained financially from the misappropriated funds.

98. Defendants collectively have not returned the property at issue.

**Third Cause of Action: Violation of California Penal Code § 496—
Receiving and/or Concealing Stolen Property**

**(Against All Defendants)**

99. Plaintiffs reallege and reincorporate by reference the preceding allegations as though fully set forth herein.

100. Plaintiffs are informed, and allege on information and belief, that at all times relevant to this Complaint, Defendants violated California Penal Code § 496 by obtaining property belonging to Plaintiffs by theft, the misappropriated funds, and knowingly withholding the property from Plaintiffs, or by aiding in obtaining and knowingly withholding said property, or by recklessly disregarding or being deliberately indifferent to the likelihood that such property was stolen.

101. Plaintiffs have been injured by Defendants' violation of California Penal Code § 496.

102. Pursuant to California Penal Code § 496(c), Plaintiffs and the Class are entitled to three times the amount of their actual damages, an amount to be proven at trial, cost of suit, and their reasonable attorney's fees for prosecuting this action.

**Fourth Cause of Action: Negligent Receipt of Stolen Property**

**(Against All Defendants)**

103. Plaintiffs reallege and reincorporate by reference the preceding allegations as though fully set forth herein.

104. Plaintiffs are informed, and allege on information and belief, that at all times relevant to this Complaint, Defendants obtained property belonging to Plaintiffs. Defendants knew or should have known that such property was obtained by illegal means.

105. Goldman, in particular, proceeded with the 2013 $3 billion bond offering despite the fact that $1.368 billion of the 2012 offerings ended up in an account in the British Virgin Islands.

106. In dismissing Leissner earlier this year, Goldman's stated reason was providing inaccurate information. Goldman did not give as the cause the more than $2.6 billion of funds almost immediately misappropriated from its $6.5 billion in offerings.

107. Plaintiffs and the Class have suffered from financial distress, annoyance, and anxiety as a result of Defendants' actions alleged herein, and seek damages in an amount to be determined at trial.

**Fifth Cause of Action: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968**

**(Against Defendants Riza Aziz, Jho Low, McFarland, and Johnson)**

108. Plaintiffs reallege and reincorporate by reference the preceding allegations as though fully set forth herein.

109. Red Granite and Metropolis IX are enterprises engaged in interstate commerce within the United States. Red Granite and Metropolis IX are funded with monies that include the proceeds of offenses against a foreign nation that involve bribery of public officials, or

misappropriation, theft, or embezzlement of public funds by a public official. Plaintiffs are informed and believe that public officials in Asia and the Middle East have taken bribes and/or misappropriated, stolen or embezzled funds, and those ill-gotten funds have then been invested in Red Granite and Metropolis IX.

110. Defendants Riza Aziz, McFarland, and Johnson are associated with Red Granite, and participate directly in the conduct of Red Granite's affairs. Johnson operated through her entity, Metropolis IX, to facilitate transactions involving Red Granite and Riza Aziz.

111. Defendants Riza Aziz, Jho Low, Red Granite, Johnson, and Metropolis IX have engaged in an enterprise, separate from the Defendants themselves. Their enterprise engaged in a pattern of racketeering activity, in that they have engaged in multiple financial transactions within the United States—including the financing of "*The Wolf of Wall Street*" and then separately funding other enterprises with the ill-gotten gains—with knowledge that the property involved represented the proceeds of illegal activity and with knowledge that the transactions were designed to conceal the nature, location, source, ownership, or control of the proceeds of the illegal activity, all in violation of 18 U.S.C. § 1956. The transactions occurred after Red Granite was formed in 2010.

112. On information and belief, Johnson further left NKFSB in 2014 and joined Metropolis IX to further the conspiracy. The evidence contained in the Government's verified complaint suggests that partners at NKFSB raised concerns about Riza Aziz's and Red Granite's business practices, which, on information and belief, necessitated the formation of a new entity where such questions would not be asked.

113. Defendants have used and invested the proceeds of their pattern of racketeering activity in the operation of Red Granite and Metropolis IX in violation of 18 U.S.C. § 1962(a). Defendants have materially benefitted.

114. Defendants Jho Low and McFarland were gifted a combined $100 million in artwork for no monetary consideration. On information and belief, the funds used to purchase the artwork was misappropriated from 1MDB and laundered through Tanore Finance Corporation in violation of 18 U.S.C. § 1956. The transactions occurred after Tanore Finance Corporation obtained $1.26 billion in proceeds from the $3 billion Goldman bond issue for which the stated purpose was a property-development project in Kuala Lumpur.

115. Plaintiffs have been injured in their property through the racketeering activity. The amount of the resulting damages shall be proven upon the trial of this action.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, pray for Judgment as follows:

A. An award of actual damages;

B. Restitution and/or restitutionary disgorgement of profits wrongfully obtained by the Defendants;

C. An award of treble damages in an amount to be proven at trial for prosecuting this action under RICO and California Penal Code § 496(c);

D. An award of punitive damages sufficient to deter and make an example of Defendants;

E. An award of Plaintiffs' costs and expenses of this action; reasonable attorney's fees; and pre- and post-judgment interest as provided by law; and

F. Such other and further relief as the Court may deem just and equitable.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedures 5(d) and 38(a), (b) and (c), Plaintiffs hereby demand trial by jury of each and all of their claims, to the extent permitted by controlling law.

Dated: August 11, 2016

Respectfully submitted,

LOUIS F. BURKE PC

By: *\/s/Louis F. Burke*

Louis Burke, Esq.
Leslie S. Wybiral, Esq.
460 Park Avenue, 21st Floor
New York, NY 10022
Tel. 212-682-1700
Fax 212-808-4280
lburke@lfblaw.com
lwybiral@lfblaw.com

AJAMIE, LLP

By: */s/Thomas R. Ajamie*

Thomas R. Ajamie, Esq.
Dona Szak, Esq. (pending *pro hac vice*)
Justin C. Pfeiffer, Esq. (pending *pro hac vice*)
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Tel. 713-860-1600
Fax 713-860-1699
tajamie@ajamie.com
dszak@ajamie.com
jpfeiffer@ajamie.com

*Counsel for Plaintiffs*